## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DIAMOND STATE DOOR, LLC, a Limited
Liability Company

            Plaintiff,

    v.

DIAMOND STATE POLE BUILDINGS,
LLC, D/B/A DIAMOND STATE
OVERHEAD DOORS, a Limited Liability
Company

           Defendant.

Civil Action No. 21-1258-RGA

### <u>MEMORANDUM OPINION</u>

Thomas H. Kramer, Anthony N. Delcollo, OFFIT KURMAN, P.A., Wilmington, DE.

    Attorneys for Plaintiff.

John C. Andrade, Elio Battista, Jr., Kyle F. Dunkle, PARKOWSKI, GUERKE & SWAYZE,
P.A., Dover, DE.

    Attorneys for Defendant.

May 24, 2023



**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Before me is Defendant's motion for summary judgment. (D.I. 40). The parties have fully briefed the motion. (D.I. 41, 64, 65).  For the reasons stated below, Defendant's motion is granted.

## I.   BACKGROUND

Plaintiff sells, installs, and repairs doors for commercial and residential use. (D.I. 1, ¶ 6). Plaintiff has been operating in Maryland, New Jersey, and Pennsylvania, using the mark "Diamond State Door," since 2013. (D.I. 1, ¶¶ 7-8; D.I. 64 at 10 (citing D.I. 64-1, Ex. A, 9:10-14, 21:4-9)).

In August 2020, Plaintiff attempted to register the mark "Diamond State Door." (D.I. 41-5, Ex. 5 at 118 of 178 (Exhibit 1 of Bradford Deposition)). The application was originally rejected because "Diamond State" was determined to be geographically descriptive. (D.I. 41-4, Ex. 4 at DSD 000047). In November 2020, Plaintiff submitted an amended application under Lanham Act § 2(f) claiming the mark had acquired distinctiveness. (D.I. 41-4, Ex. 4 at DSD 000038). Section 2(f) permits registration of a mark "which has become distinctive of the applicant's goods in commerce." 15 U.S.C. § 1052(f). Plaintiff's application was granted. (D.I. 1-1, Ex. A).

Defendant, Diamond State Pole Buildings, has been in business in Delaware since 2008. (D.I. 41 at 6 (citing D.I. 41-6, Ex. 6, ¶ 3)). In 2019, Defendant created "Diamond State Overhead Doors" as a division of its business. (*Id.*, Ex. 6, ¶ 7). Since 2019, Diamond State Overhead Doors has been selling overhead doors in Delaware and the Eastern Shore of Maryland. (D.I. 41 at 7 (citing D.I. 41-6, Ex. 6, ¶ 9)).

Plaintiff filed this lawsuit on September 1, 2021. Plaintiff asserts claims of trademark infringement under 15 U.S.C. § 1114(1) (Count I), false designation of origin under 15 U.S.C. § 1125(a) (Count II), violations of the Delaware Deceptive Trade Practices Act, 6 Del. C. §§ 2531

*et seq.* (Count III), and tortious interference with prospective business advantage (Count IV).

(D.I. 1 at 7-11).

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a).  The moving party has the initial burden of proving the absence of a genuinely

disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317,

330 (1986).  Material facts are those "that could affect the outcome" of the proceeding. *Lamont v.*

*New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986)).  "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to

permit a reasonable jury to return a verdict for the nonmoving party." *Id.*  The burden on the

moving party may be discharged by pointing out to the district court that there is an absence of

evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue

for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986);

*Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989).  A non-moving party

asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other

materials; or (B) showing that the materials cited [by the opposing party] do not establish the

absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1).  The non-moving party's evidence

"must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than

a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## III.   DISCUSSION

The elements of federal trademark infringement and federal unfair competition are (1) the mark is valid and protectable; (2) Plaintiff owns the mark; and (3) Defendant's use of the mark causes a likelihood of confusion. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). Violations of the Delaware Deceptive Trade Practices Act are evaluated under the same standard. *Treasury Mgmt. Servs., Inc. v. Wall St. Sys. Delaware, Inc.*, 2017 WL 1821114, at *5 (D. Del. May 5, 2017) (citing *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 WL 4049799 (D. Del. Sept. 13, 2012)).

Defendant argues that it is entitled to summary judgment on each count because Plaintiff's mark is not valid and protectable. (D.I. 41 at 2, 8, 19). Defendant contends that Plaintiff's mark is geographically descriptive and is not protectable because it lacks secondary meaning. (*Id.* at 8-9).

Plaintiff contends its mark has secondary meaning. Plaintiff argues that Defendant is not entitled to summary judgment because there are genuine issues of material fact as to whether its mark has secondary meaning.

### A. Secondary Meaning

"If the mark has not been federally registered or, if registered, has not achieved incontestability, then validity depends on proof of secondary meaning, unless the unregistered or

4

contestable mark is inherently distinctive." *Com. Nat'l Ins. Servs., Inc. v. Com. Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000) (footnotes and internal quotation marks and citations omitted). Plaintiff has registered its mark, but has not argued that its mark is inherently distinctive or that it has achieved incontestability status. Therefore, "[P]laintiff must establish secondary meaning in [the] mark at the time and place that [D]efendant began use of the mark." *Id.*

"'Secondary meaning' is a term of art in trademark law that refers to 'a mental association in buyers' minds between the alleged mark and a single source of the product.'" *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 226 (3d Cir. 2017) (quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15:5 (4th ed. 2017)). The Third Circuit has identified a non-exclusive list of factors to consider when determining if a mark has secondary meaning:

> (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion.

*Com. Nat'l*, 214 F.3d at 438; *see Engage Healthcare Commc'ns, L.L.C. v. Intellisphere, L.L.C.*, 792 F. App'x 178, 185 (3d Cir. 2019). Both parties agree that customer testimony and the use of the mark in trade journals are not relevant in the present case as there is no evidence in record concerning these factors. (D.I. 41 at 17; D.I. 64 at 11). I address the remaining factors.

## 1. **Extent of Advertising**

Defendant argues this factor weighs against a finding of secondary meaning because secondary meaning is "generally established through *extensive* advertising" and Plaintiff has not conducted extensive advertising. (D.I. 41 at 13 (citing *Com. Nat'l*, 214 F.3d at 438)). Defendant tabulated and summarized Plaintiff's advertising expenditures from 2013-2019 (D.I. 41 at 3 (citing

D.I. 41, Ex. 3)).[1] Defendant argues that averaging advertising expenditures of around $22,000 per year over this six-year period is not extensive enough to weigh in favor of secondary meaning.

Defendant cites to *Good 'N Nat. v. Nature's Bounty, Inc.*, 1990 WL 127126, at *9 (D.N.J. Aug. 30, 1990), for support. In *Good 'N Nat.*, the court found similar advertising expenditures over a six-year period (starting at $4,113 in year 1978 and growing to $43,183 in 1983) not to be extensive. *Id.* at *11.[2]

Plaintiff argues its advertising expenditures are "not so unexceptional as Defendant[] disparagingly suggest[s] and are sufficient for a business of Plaintiff's limited geographic reach to support secondary meaning, and present a factual issue that must be resolved at trial." (D.I. 64 at 10). Plaintiff distinguishes this case from *Good 'N Nat.* by pointing out that (1) it has spent more over the six-year period on advertising than the plaintiff in *Good 'N Nat.*,[3] (2) the expenditures in *Good 'N Nat.* included expenditures from a business that was not a party to the suit, and (3) the expenditures were spent over a larger geographic region. (D.I. 64 at 9-10).

I agree with Defendant that this factor weighs against finding secondary meaning. Secondary meaning "is established through extensive advertising which creates in the minds of

---

[1] Plaintiff does not dispute the figures calculated by Defendant. (D.I. 64 at 9 ("Defendant helpfully tabulates Plaintiff's sales and advertising expenditures, disclosed by Plaintiff in discovery in their brief.")).

[2] A dollar in 1980 was worth perhaps more than 2 ½ times what it was worth in 2015. *See Databases, Tables & Calculators by Subject*, U.S. Bureau of Labor Statistics, https://data.bls.gov/timeseries/CUUR0000SA0 (last visited May 19, 2023) (ratio of consumer price index in 2015 to 1980 is 2.87). Because the consumer price index covers a variety of categories of goods and services, advertising expenditures may not have experienced the same level of inflation. *See Consumer Price Index*, U.S. Bureau of Labor Statistics (Jan. 23, 2023), https://www.bls.gov/cpi/overview.htm.

[3] Plaintiff has spent $133,366.57 (D.I. 41 at 3) and the plaintiff in *Good 'N Nat.* spent $88,831. 1990 WL 127126 at *9. After accounting for inflation, the amount spent by Plaintiff is likely less than what was spent in *Good 'N Nat. See supra* n.2.

consumers an association between the mark and the provider of the services advertised under the mark." *Com. Nat'l Ins.*, 214 F.3d at 438. "Use of a mark 'for a long period of time in a prevalent advertising campaign' can 'create a reasonable inference' of secondary meaning." *Parks*, 863 F.3d at 231 (quoting *E.T. Browne Drug Co. v. Cococare Prod., Inc.*, 538 F.3d 185, 200 (3d Cir. 2008)). The advertising conducted by Plaintiff was not extensive.

Plaintiff's advertising expenditures are modest and only existed for a relatively short period of time. While Plaintiff has been advertising under the mark since 2013, its expenditures for 2013 and 2014 were only $1,018 and $1,731, respectively. Those two years of expenditures are hardly indicative of "extensive advertising." Even though Plaintiff's advertising expenditures are more substantial for 2015-2019, peaking at $43,492 in 2019 (D.I. 41 at 3), that is not sufficient to establish extensive advertising. The extent of advertising factor is not solely dependent on the amount of money spent, but also the type of advertising conducted. *See E.T. Browne*, 538 F.3d at 200 ("A plaintiff could create a reasonable inference, for example, that a term had gained secondary meaning by showing that it had appeared for a long period of time in a prevalent advertising campaign."); *Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571, 584 (D.N.J. 1985) ("Although plaintiff has expended considerable sums of money in marketing its product, the court finds that they have not met their burden of demonstrating that 'Honey Roast' is viewed by the public as designating the source of the product, . . . .").

There is no evidence to support a reasonable inference that Plaintiff's advertising has created secondary meaning. Plaintiff "has advertised through the phone book, word of mouth, and Google." (D.I. 64 at 2 (citing D.I. 64-1, Ex. A at 11:21-12:7)). Plaintiff previously used "Valpak," which is an "every door direct mailer." (D.I. 64-1, Ex. A at 12:1-4). These efforts do not support a reasonable inference that Plaintiff was engaged in a prevalent campaign over a long period of

time. *See Parks*, 863 F.3d at 231-32 (noting spending $14,000 a year on circular advertisements and in-store product demonstrations by a licensee of the mark did not support a finding of extensive advertising); *E.T. Browne*, 538 F.3d at 200.

Given the modest amount spent on advertising, the relatively short period of time of advertising, and the lack of a prevalent advertising campaign, no reasonable factfinder could determine that the extent of Plaintiff's advertising "would create the necessary mental association between the mark and product." *Parks*, 863 F.3d at 232. Therefore, this factor weighs against a finding of secondary meaning.

### 2.  Extent of Sales, Number of Customers, Size of Company

Defendant argues that Plaintiff is a "small business by sales," which weighs against finding secondary meaning. Defendant calculated Plaintiff's sales as rising from $129,016.12 in 2013 to $1.2 million in 2019. (D.I. 41 at 3). Defendant contends that sales were "timid" for most of the period, only passing $500,000 in 2015. (*Id.* at 14).

Plaintiff argues that its business is not "small" as it has grown significantly over the six-year period. (D.I. 64 at 12). Plaintiff contends that its sales are "sufficient for a business of Plaintiff's limited geographic reach to support secondary meaning" and create a factual issue to be resolved at trial. (*Id.* at 10).

> The size of a company, its total sales, and the size of its customer base can also be probative of secondary meaning because the jury is entitled to draw the logical inference that "[t]he larger a company and the greater its sales, the greater the number of people who have been exposed to [the] symbol used as a trademark, and the greater the number of people who may associate [that] symbol with a company or source with which they should be familiarized."

*Parks*, 863 F.3d at 235 (alterations in original) (quoting 2 *McCarthy on Trademarks and Unfair Competition* § 15.49).

I find these factors to be neutral in this case. First, neither party has provided any information regarding the size of Plaintiff as a company or the number of customers it has. (D.I. 41 at 17 (characterizing Plaintiff as small by its sales); D.I. 64 at 12 (citing sales figures as evidence of company size and number of customers)). Plaintiff's growing sales supports the inference that the number of customers it has increased over the six-year period, but I do not think it is enough to create a genuine issue for trial that Plaintiff is a large company or has a large customer base.

Second, while Plaintiff's sales figures are undisputed, these raw figures are uninformative. While greater sales weighs in favor of secondary meaning, "[r]aw sales figures need to be put into context to have any meaning." *Parks*, 863 F.3d at 235 (alteration in original) (quoting 2 *McCarthy on Trademarks and Unfair Competition* § 15.49). For example, in *Parks*, the Third Circuit contextualized the sales figures by analyzing the plaintiff's market share rather than its raw sales numbers. *Id.* No such context has been provided here and the order of magnitude of the sales on their face are not sufficiently large such that one could reasonably infer secondary meaning. Even though Plaintiff has argued that its sales are sufficient based on its geographic reach, it has not provided any evidence to support that assertion.

Because neither side has provided information regarding Plaintiff's size, the number of customers it has, or the context of its sales figures in its market, I find these factors to be neutral.

### 3. Length of Use and Exclusivity

Defendant argues the length of use and the exclusivity of use weigh against secondary meaning because Plaintiff has only been using the mark for six years prior to Defendant using its mark. Defendant contends that Plaintiff's use of the mark was not exclusive as "hundreds of active Delaware-registered businesses" use the term "Diamond State." Defendant cites to *Good 'N Nat.*

for support where the court found six years of exclusive use of a "highly descriptive" mark not to be, "by itself[,] significantly probative of secondary meaning." 1990 WL 127126, at *11.

Plaintiff argues that these factors weigh in favor of secondary meaning. Plaintiff argues it has used "Diamond State Door" exclusively since 2013 and whether other companies use "Diamond State" in their names is not relevant. (D.I. 64 at 10-11).

It is not disputed that Plaintiff has had exclusive use over the mark "Diamond State Door" since 2013. These facts are similar to *Good 'N Nat.*, where the court determined a descriptive mark that had been used exclusively for six years was not significantly probative of secondary meaning. 1990 WL 127126, at *11.

Plaintiff has not cited to any case law that has found exclusive use for such a short period of time to weigh in favor of a finding of secondary meaning. Third Circuit case law indicates such a short period, without more evidence, is insufficient to create a genuine issue of fact as to whether a mark has attained secondary meaning. For example, in *Parks*, the Third Circuit found that 50 years of exclusive use weighed in favor of secondary meaning, but it was not sufficient to "carry the day" when Parks had "not cited to any evidence to attempt to quantify how widespread the name was known over those years." *Parks*, 863 F.3d at 232 (citation omitted). Here, the length of exclusive use is substantially shorter than in *Parks* and Plaintiff's evidence is similarly lacking.

Taking all reasonable inferences in favor of Plaintiff, I find a reasonable factfinder could not determine that this factor weighs in favor of a finding of secondary meaning.

### 4. Evidence of Copying

Defendant argues that Plaintiff has only offered conjecture that Defendant copied Plaintiff's mark. (D.I. 41 at 15-16). Defendant contends that it developed its name as an offshoot from its own name, "Diamond State Pole Buildings." (D.I. 41-6, Ex. 6, ¶¶ 6-7, 10).

Plaintiff argues there is at least a disputed material fact as to whether Defendant copied the name from Plaintiff's mark. Mr. Bradford stated in his deposition that Defendant adopted the name shortly after they performed work for him. (D.I. 64-1, Ex. A at 34:16-36:23).

Given the timing of when Defendant began using its mark, relative to its exposure to Plaintiff's mark, and taking all reasonable inferences in Plaintiff's favor, which I am required to do, there is some evidence indicating Defendant may have copied the mark from Plaintiff. At this stage, a reasonable factfinder could determine that this factor weighs in favor of finding secondary meaning.

### 5. Customer Survey

Plaintiff has not conducted a customer survey. Defendant contends that without a customer survey "the balance of all other factors of consideration must disproportionately weigh in Plaintiff's favor" to find secondary meaning in the mark. (D.I. 41 at 12). Defendant cites to *Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571, 583 (D.N.J. 1985), for the proposition that "failure to produce a customer survey supports an inference that the results would have been unfavorable." (D.I. 41 at 11).

Plaintiff contends that a customer survey is not a prerequisite for finding secondary meaning under Third Circuit law and, therefore, should not weigh against it. (D.I. 64 8-9).

I agree with Plaintiff that this factor is irrelevant in this case. The Third Circuit has consistently held that a customer survey is not required to established secondary meaning. *E.T. Browne Drug Co. v. Cococare Prod., Inc.*, 538 F.3d 185, 201 (3d Cir. 2008) ("We never have held, and do not hold today, that a party seeking to establish secondary meaning must submit a survey on that point."); *see also Parks*, 863 F.3d at 234-35 (finding that the customer survey factor favored neither party when the only survey done was not probative of secondary meaning).

Because Plaintiff has not conducted a customer survey, I find this factor to be irrelevant.[4]

### 6. Actual Confusion

Defendant argues this factor weighs against secondary meaning because "the number of purportedly confused individuals is exceptionally small," "any confusion as to the naming stems not from any acquired distinctiveness of Plaintiff's use of 'Diamond State,' but from Plaintiff's decision" to use Diamond State in its name. (D.I. 41 at 17-18).

Defendant cites to the depositions from four[5] of its customers for support that there is no secondary confusion. Three of the deponents stated they had never heard of Plaintiff. (D.I. 65, Ex. A at 9:22-24 (Fasteson deposition); D.I. 65, Ex. B at 10:7-10 (Moran deposition); D.I. 65, Ex. C at 10:21-23 (Crissman deposition)). Defendant cites to the deposition of Mr. Eichelberger, who testified that he would select a company based on the county it was in (D.I. 65, Ex. D at 11:16-24), to support their argument that there is no actual confusion. I don't find these depositions to be particularly helpful as the fact that some individuals were not confused does not mean others were not confused. It is not necessary that each and every member of the buyer class associate the mark with a single source. 2 *McCarthy on Trademarks and Unfair Competition* § 15:45 ("Nor is it

---

[4] I think a well-designed customer survey would be the best direct evidence of secondary meaning. Most of the other factors are indirect evidence of secondary meaning and require a lot of context to be meaningful. One drawback of customer surveys, however, is that they require an expert and are expensive. At least in this case, I cannot imagine that a rational plaintiff would decide the value of the litigation justifies that sort of expenditure. I believe this is consistent with *Eagle Snacks*, where the court limited its inference regarding unfavorable survey results to situations where the plaintiff "has the financial means" of conducting a survey. *Eagle Snacks*, 625 F. Supp. at 583.

[5] Defendant also cites to the deposition testimony of Mr. Wersinger, one of its customers. (D.I. 64-9, Ex. I) Defendant, however, argues Mr. Wersinger's confusion does not support Plaintiff's argument. I address this below.

necessary that a majority of that group do so. It is only necessary that a 'substantial part' of the buying class make such an association.").

Plaintiff counters that it has "assembled more than a scintilla of evidence to support actual confusion" by citing to instances were individuals were confused between Plaintiff and Defendant. Plaintiff points to seven instances where individuals confused Plaintiff with Defendant (D.I. 64 at 12-13): (1) an affidavit from Edward Schinner, a potential customer who mistook Defendant's listing on Google for Plaintiff (D.I. 64-3, Ex. C); (2) an affidavit from Frank Welsh, owner of Customer Theater Design Security, who has a business relationship with Mr. Bradford, has known Plaintiff for four years, and confused Defendant's listing on Google for Plaintiff (D.I. 64-4, Ex. D); (3) an affidavit from Randy Perkins, owner of Expert Overhead Doors, who has a business relationship with Mr. Bradford, has known Plaintiff for 15 years, and mistook Defendant's advertisement on Facebook for Plaintiff's (D.I. 64-5, Ex. E); (4) deposition testimony of Tom Wersinger, a customer of Defendant who later contacted Plaintiff thinking Plaintiff was Defendant (D.I. 64-9, Ex. I); (5) an email from Andy Trout, a representative from Plaintiff's supplier, who mistook Defendant's listing on Google for Plaintiff (D.I. 64-8, Ex. H); (6) Mr. Bradford's deposition testimony about an unnamed individual who scheduled and canceled an appointment with Plaintiff (D.I. 64-1, Ex. A at 40:9-42:3); and (7) Mr. Bradford's deposition testimony about a customer named Polella who was Defendant's customer and later mistook Plaintiff for Defendant (D.I. 64-1, Ex. A at 50:15-24).

### a. Admissibility of Bradford Deposition

I find that not all of Mr. Bradford's testimony is admissible. Mr. Bradford is the founder and principal of Diamond State Door. Mr. Bradford testified that on July 27, 2020, an individual

called Plaintiff believing they had "previously engaged with Plaintiff's company." (D.I. 64 at 3).[6] Mr. Bradford testified that the individual had never called the company before. (D.I. 64-1, Ex. A at 41:17-21). Mr. Bradford testified that the individual scheduled an appointment and then later canceled it. (*Id.*, Ex. A at 40:9-42:3).

I find this instance of confusion with the unnamed individual has no probative value to secondary meaning. Nothing about Mr. Bradford's testimony is indicative of confusion, let alone confusion that is relevant to secondary meaning. Mr. Bradford did not interact with the individual; his office manager did. (D.I. 64-1, Ex. A at 41:9-18). Therefore, I do not believe he can testify as to the substance of the conversation with the individual. Even if he could, there would be hearsay issues. Mr. Bradford's testimony is only admissible to the extent that an appointment was made and then canceled, which would likely be based on personal knowledge. Without more, I don't think it is a reasonable inference that the individual canceled the appointment because he was confused about the company name.

Mr. Bradford additionally testified that an individual named Polella called Plaintiff under the mistaken belief that Plaintiff installed his garage doors. Mr. Bradford visited the site and saw Defendant's name on the installed doors. (D.I. 64-1, Ex. A at 49:2-11). Mr. Bradford testified that Polella told him that Polella originally intended to engage with Bradford's company. (D.I. 64-1, Ex. A at 50:16-24).

With respect to Polella, Mr. Bradford's testimony indicates that Polella confused Plaintiff's and Defendant's marks. Polella's confusion is probative of secondary meaning. Mr. Bradford's

---

[6] In his deposition, Mr. Bradford also testified about confusion regarding Mr. Schinner, Mr. Welsh, Mr. Trout, and Mr. Perkins. Because Plaintiff has supplied affidavits and other exhibits to support those instances of confusion, it is not necessary to rely on Mr. Bradford's deposition testimony for these other incidents.

statement regarding Polella's original intent to hire Plaintiff is inadmissible hearsay as it is an out

of court statement offered for the truth of the matter asserted. *See* Fed. R. Evid. 802. (D.I. 64-1,

Ex. A at 50:16-24).

### b. Analyzing the Evidence

The evidence of actual confusion that is indicative of secondary meaning amounts to the

affidavits from Mr. Schinner, Mr. Welsh, Mr. Wersinger, Mr. Perkins, Mr. Trout's email

expressing confusion, and Mr. Bradford's testimony regarding Polella.

I do not think a reasonable factfinder could determine that this factor weighs in favor of

secondary meaning based on this evidence. The probative values of experiences like Mr. Trout

and Mr. Perkins are limited as these are individuals in the industry, who have a business

relationship with Plaintiff, rather than members of the consuming public. *See Ford Motor Co. v.*

*Summit Motor Prod., Inc.*, 930 F.2d 277, 296 (3d Cir. 1991) ("There is no indication of what

average consumers, rather than industry insiders, think. Hence, we are reluctant to give any of the

above testimony determinative weight."); *see also Engage Healthcare Commc'ns, L.L.C. v.*

*Intellisphere, L.L.C.*, 792 F. App'x 178, 185 (3d Cir. 2019) ("[T]he consumers' interpretation of,

and sentiment toward, the alleged marks are paramount in determining whether such marks have

achieved secondary meaning.").[7]

I think the probative value of Mr. Schinner's declaration is limited. Mr. Schinner states that

he sought out Plaintiff because Mr. Bradford's uncle recommended Plaintiff in 2020. Mr. Schinner

does not state that he was previously familiar with Plaintiff or its mark prior to 2020. While Mr.

---

[7] I note that the declarations from Mr. Bradford, Mr. Welsh, and Mr. Perkins, are from "friendly" sources who have business relationships with, or are affiliated with, Plaintiff. The Third Circuit has recognized that "declarations from friendly sources are potentially 'self-serving and of little probative value.'" *Parks*, 863 F.3d at 236 (quoting *815 Tonawanda St. Corp. v. Fay's Drug Co.*, 842 F.2d 643, 648 (2d Cir. 1988)).

Schinner confused Defendant's listing on Google for Plaintiff, it seems his confusion stemmed from the similarity of the marks, not from Plaintiff's mark having attained secondary meaning. *See Parks*, 863 F.3d at 234 ("Consumers may find an association even if both marks were previously unknown to them.").

Defendant argues the deposition testimony of Mr. Wersinger, is not probative of secondary meaning because Mr. Wersinger confused Plaintiff with "Diamond State Pole Buildings," not "Diamond State Overhead Doors." (D.I. 65 at 8 (citing D.I. 64-9, Ex. I at 15:5-7)). Typically, evidence of actual confusion pertains to confusion between the plaintiff's mark and the accused infringing mark. *See, e.g.*, *Parks*, 863 F.3d at 236 (discussing evidence of actual confusion between the accused mark and the plaintiff's mark); 2 *McCarthy on Trademarks and Unfair Competition* § 15:30 (stating that "evidence of actual confusion caused by the accused designation" is among the "types of evidence most often used to prove" secondary meaning has been achieved). Taking all reasonable inferences in Plaintiff's favor, I think Mr. Wersinger's confusion is probative as to whether Plaintiff's mark has secondary meaning. The key inquiry with respect to whether a mark has attained secondary meaning is whether there is "a mental association in buyers' minds between the alleged mark and a single source of the product." *Parks*, 863 F.3d at 226 (quoting 2 *McCarthy on Trademarks and Unfair Competition* § 15:5). While Mr. Wersinger confused "Diamond State Pole Buildings," which is not at issue in this case, for Plaintiff's mark, taking all reasonable inferences in Plaintiff's favor, I think one could infer that Mr. Wersinger had created an association with Plaintiff's mark from the fact that he confused a similar name for Plaintiff's mark. *See* 2 *McCarthy on Trademarks and Unfair Competition* § 15:11 ("If buyers are confused between two sources, then this also means that they must have recognized plaintiff's designation as a trademark and associated it only with plaintiff.").

Plaintiff has produced evidence of actual confusion, but the fact there is some evidence of actual confusion does not mean this factor necessarily weighs in favor of secondary meaning, let alone creates a genuine issue of a material fact. *See Parks*, 863 F.3d at 236 ("If anything, the paucity of proof of actual confusion suggests that the PARKS mark lacks secondary meaning."); *Flynn v. Health Advoc., Inc.*, 169 F. App'x 99, 102 (3d Cir. 2006) (finding a call log that recorded instances when people mistakenly called plaintiff when they intended to call the defendant as the only evidence of actual confusion "did not rise to the level of establishing secondary meaning"). That Plaintiff has produced a handful of instances of confusion does not support a finding of secondary confusion. *See 2 McCarthy on Trademarks and Unfair Competition* §§ 15:41 ("The testimony of only one or a few consumers is usually insufficient to support a finding of secondary meaning."), 15:45 ("For example, the C.C.P.A. (predecessor of the Federal Circuit) emphasized that secondary meaning requires proof that more than a 'relatively small number of people' associate the designation with the applicant for registration. Other courts have stressed that if the evidence shows that only a few people attach a secondary meaning to the designation, that is not adequate." (footnotes and citations omitted)).

Taking all reasonable inferences in Plaintiff's favor, a reasonable factfinder could not determine that this factor weighs in favor of finding secondary meaning.

### 7. Weighing Factors

I find that Defendant is entitled to summary judgment that Plaintiff's mark lacks secondary meaning. Plaintiff argues that there are issues of fact for different factors that can only be resolved at trial. I disagree.

The Third Circuit "never ha[s] held that the test for secondary meaning is determined by some mechanical application of a non-exclusive eleven-factor list, nor by counting how many of

the eleven factors a plaintiff can satisfy." *Engage Healthcare*, 792 F. Appx. at 185. "[T]he consumers' interpretation of, and sentiment toward, the alleged marks are paramount in determining whether such marks have achieved secondary meaning." *Id.* Plaintiff has failed to provide evidence to raise a genuine issue of fact that consumers would interpret its mark as having secondary meaning.

The only evidence Plaintiff has provided to support a finding of secondary meaning is that it has used the mark exclusively since 2013, which is a relatively short period of time, a timeline indicating that Defendant may have copied the mark, and a handful of instances of actual confusion. As discussed above, however, these factors do not weigh heavily in favor of finding secondary meaning. Considering that Plaintiff has not conducted extensive advertising, nor provided evidence to demonstrate that its size, the number of customers it has, or its sales are large enough to support the inference that many people associate its mark with itself, Plaintiff's evidence is not sufficient to create a genuine issue of fact that its "mark is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services." *Com. Nat'l*, 214 F.3d at 438. "To find secondary meaning, jurors would have to make an impermissible leap of faith." *Parks*, 863 F.3d at 236 (internal quotation marks and citation omitted).

For these reasons, Plaintiff's mark of "Diamond State Door" is not a valid or protectable mark because it is a geographically descriptive mark that lacks secondary meaning. Because the mark is not valid and protectable, Defendant is entitled to summary judgment on the claims of federal trademark infringement, federal unfair competition, and violation of Delaware Deceptive Trade Practices Act.

### B. Tortious Interference with Prospective Economic Advantage

I find that Defendant is entitled to summary judgment on Plaintiff's claim for tortious interference with prospective economic advantage. The elements of tortious interference are "(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted." *Truinject Corp. v. Galderma, S.A.*, 2020 WL 5095448, at *6 (D. Del. Aug. 28, 2020) (quoting *Enzo Life Scis., Inc. v. Digene Corp.*, 295 F. Supp. 2d 424, 429 (D. Del. 2003)), *report and recommendation adopted*, 2020 WL 6817088 (D. Del. Nov. 20, 2020). Under Delaware law, the conduct underlying a claim for tortious interference with prospective economic advantage must be wrongful. *See KT4 Partners LLC v. Palantir Techs., Inc.*, 2018 WL 4033767, at *6 (Del. Super. Ct. Aug. 22, 2018) ("[A] plaintiff must also allege that the conduct was 'wrongful' to support a claim for tortious interference with prospective economic advantage . . . .").

Plaintiff's tortious interference claim is based on "Defendant's use of the trade name 'Diamond State Overhead Doors.'" (D.I. 1, ¶ 63). Because I have determined Plaintiff's mark to not be protectable, Defendant's use of the mark is not wrongful.

Furthermore, in its Answering Brief, Plaintiff only argued that its mark had acquired secondary meaning. Plaintiff did not raise any arguments as to why Defendant is not entitled to summary judgment on Count IV if I determined its mark to be invalid and unprotectable.

### IV.   CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted. An appropriate order will issue.

19